IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| NICHOLAS D. MACCARI and<br>VICTORIA R. MACCARI, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-258 (GMS) |
| | ) | |
| BITUMINOUS CASUALTY<br>CORPORATION, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM

## I.   INTRODUCTION

The plaintiffs, Nicholas D. Maccari and Victoria R. Maccari (the "Maccari plaintiffs"),

filed a complaint against the defendant, Bituminous Casualty Corporation ("Bituminous"), on

February 26, 2009, in the Superior Court of the State of Delaware in and for New Castle County.

Bituminous removed the case to the United States District Court for the District of Delaware on

April 17, 2009, pursuant to 28 U.S.C. § 1441. The court has jurisdiction pursuant to 28 U.S.C. §

1332 because there is diversity of citizenship between the parties and the amount in controversy

exceeds the statutory minimum. Count I of the complaint alleges bad faith breach of contract for

Bituminous' failure to promptly pay policy limits. Count II alleges breach of the implied duty of

good faith and fair dealing. The Maccari plaintiffs seek punitive damages, interest, and costs.

Presently before the court is Bituminous' motion for summary judgment. This motion

has been fully briefed and argued. For the following reasons, the court will grant Bituminous'

motion for summary judgment.

## II.   BACKGROUND

### A.   The 1999 Accident

On or about March 1, 1999, plaintiff Nicholas Maccari ("Maccari") was the driver of a

1998 Ford van that was rear-ended by a 1999 Lincoln Navigator when its driver, Eman Zaki

("Zaki"), failed to stop at a red traffic light. (D.I. 1 ¶¶ 4-6.) This collision caused Maccari's van

to hit the rear of the vehicle that was stopped directly in front of him. (Id. ¶ 6.) As a result of

this car accident, Maccari suffered serious bodily injury. (Id. ¶ 8.)

The van was owned by the Maccari family's commercial painting business, and it was

covered by an underinsured motorist insurance policy ("UIM") issued by Bituminous with a

coverage limit in the amount of $1,000,000. (D.I. 61 at B62, §§ 91-92; D.I. 1 ¶ 15.) UIM

supplements insurance coverage where a negligent tortfeasor's insurance is limited and

exhausted. (D.I. 61 at B67, sections 110-12.) Zaki was found to be negligent. (D.I. 1 ¶ 7.) Zaki

was insured for auto liability by State Farm up to a maximum of $100,000 per person. (Id. ¶ 14.)

Prior to receiving money from State Farm, Maccari sought and received money from Bituminous

based on a claim for personal injury protection.

### B.   Personal Injury Protection Claim with Bituminous

Shortly after the 1999 accident, Maccari filed a claim for personal injury protection

("PIP") benefits under his Bituminous insurance policy. (D.I. 42, Ex. 1 at 72:5-13.) PIP

provides compensation to injured persons for reasonable and necessary expenses incurred within

two years from the date of the accident. (Id.) Maccari hired a lawyer, Robert Penza ("Penza"),

to represent him during the PIP arbitration process.[1] (D.I. 42, Ex. 1 at 72:14-22.) On May 24,

2001, an arbitration panel held in favor of Bituminous and determined that Maccari "failed to

---

[1] Robert Penza is co-counsel with John Spadaro for the Maccari plaintiffs in the present case.

sustain [the] burden of proof of reasonable and necessary net lost wages." (D.I. 42, Ex. 3.) On June 27, 2001, Maccari filed a lawsuit against Bituminous in the Delaware Superior Court. (D.I. 42, Ex. 4.) His complaint alleged a bad faith claim and demanded punitive damages. (Id.) On March 6, 2002, a second arbitration was held, and the arbitrator awarded $14,150.08 in lost wages for a two-year period. (D.I. 42, Ex. 5.) Maccari accepted the arbitrator's decision, which resolved his PIP and 2001 bad faith claims. (D.I. 42, Ex. 1 at 82:11-19.)

C.     **Auto Liability Claim with State Farm**

Maccari also sought compensation from Zaki's State Farm auto liability insurance policy. This required an evaluation by an independent medical examiner ("IME"). (D.I. 1 ¶ 19.) In 2002, an IME, Dr. Richard Katz ("Dr. Katz") performed a neurological examination on Maccari and found that Maccari "has no functional limitations or impairment of bodily functions." (D.I. 42, Ex. 8 at 6.) On January 14, 2003, a non-binding arbitration was held, and the arbitrator awarded Maccari $55,000. (D.I. 42, Ex. 10.) Maccari appealed. In 2004, after another examination, Dr. Katz concluded that Maccari "has no medical basis for any functional limitations or impairment of bodily function; requires no further diagnostic or therapeutic modalities in any way related to the 1999 accident and could pursue all of his chosen activities without restriction and this would include work as [a] painting contractor." (D.I. 42, Ex. 9 at 3.) Nonetheless, on or about February 23, 2004, Maccari settled with State Farm for the full $100,000 policy limit. (D.I. 1 ¶ 14.)

D.     **UIM Claim with Bituminous**

After settling with State Farm, Maccari put Bituminous on notice of his UIM claim. (D.I. 1 ¶¶ 15-17.) Penza sent Bituminous' attorney, Sean Dolan ("Dolan"), a letter dated February 20, 2004, seeking to recover for the value of Maccari's personal injury claim in excess of State

3

Farm's $100,000 settlement. (D.I. 61 at B7.) The correspondence also included a copy of a comprehensive medical report dated February 10, 2004, from Maccari's treating neurologist. (Id.) Next, Dolan sent Penza a letter dated March, 2, 2004, acknowledging receipt of Penza's correspondence and explaining that it was likely that Maccari would need to be seen by an IME. (D.I. 61 at B8.) Then Penza sent Dolan a letter dated September 24, 2004, which included an initial settlement demand of $650,000 and an updated economic analysis of Maccari's claims for lost earnings. (D.I. 61 at B9-B10.) At this point, Bituminous had yet to schedule a medical examination for Maccari or take his deposition. (Id.) By December 2004, Bituminous had established an indemnity reserve of $90,000, but did not make a settlement offer. (D.I. 61 at B81, §§ 167-168.)

On January 4, 2005, Maccari elected to arbitrate his UIM claim pursuant to the terms of the Bituminous insurance policy because a dispute remained as to the cause and extent of his injuries and the amount of his economic loss. (D.I. 1 ¶ 17.) He also indicated his selection for one of three arbitrators. (Id.) In a letter dated March 24, 2005, Bituminous presented its arbitrator selection and requested to take Maccari's deposition. (Id. ¶ 18.)

On April 8, 2005, Bituminous deposed Maccari. (D.I. 42, Ex. 13 at NDM2011.) After explaining his health condition, Maccari stated under oath that he was not able to work at all. (D.I. 42, Ex. 13 at NDM 2046, lines 14-20.) Maccari explained that he experienced neck pain (Id., line 24) and headaches (D.I. 42, Ex. 13 at NDM 2047, lines 1-4). Maccari further explained that he closed his painting business in 2003 because he was "unable to fulfill [his] duties." (D.I. 42, Ex. 13 at NDM2044, lines 4-7.)

Next, Bituminous retained an investigative firm to observe Maccari on three different days in 2005: June 30, July 1, and July 5. (D.I. 42, Ex. 35 at NDM1758.) The investigators

4

videotaped Maccari fixing automobiles and doing other physical labor at his brother's business. (Id.) More specifically, on July 1, 2005, the investigators videotaped Maccari "engaging in the following activities – bending at the waist and kneeling while welding the rear portion of a trailer, lifting the trailer ramp, using a hammer, lowering the garage bay door, operating a metal grinder, and lying on his back to reach underneath the trailer." (Id.) Additionally, on July 5, 2005, the investigators observed Maccari "bend[ing] at the waist and kneel[ing] while working on a vehicle engine." (Id.)

On August 9, 2005, Maccari submitted to an interview and examination by Dr. Allan Fink ("Dr. Fink"), an IME retained by Bituminous. (D.I. 1 ¶ 19.) Based upon that initial examination and Maccari's medical records, Dr. Fink stated that Maccari had "sustained a cervical spine injury which occurred as a result of a motor vehicle accident on March 1, 1999." (D.I. 42, Ex. 12 at 3.) He also explained that Maccari's "inability to return to work as an estimator is due to a combination of persistent pain plus medications which interfere with the ability with which he needs to focus on detailed plans and figures." (Id.) Nevertheless, Dr. Fink's initial report concluded that Maccari could work in a "light duty position full time," although it could not involve "the type of detailed cognitive function that he needed for his previous work." (D.I. 42, Ex. 12 at 4.)

In a letter dated September 8, 2005, Penza withdrew Maccari's initial $650,000 settlement demand and increased his demand to $900,000. (D.I. 61 at B18.) Penza explained to Dolan that Dr. Fink's assessment confirmed the fact Maccari cannot resume his prior occupation. (D.I. 61 at B17.) He also explained that there is a "reasonable possibility of further invasive medical treatment." (D.I. 61 at B18.) Finally, Penza reminded Dolan that "at this point,

Bituminous has a claim handling duty to my client, and its insured, to timely process this claim and pay the fair value of damages." (Id.)

Dr. Fink reviewed the investigative videos and explained in a letter dated November 14, 2005, that "these videos are consistent with an individual who can work in at least a light duty position full time, if not a moderate duty position." (D.I. 42, Ex. 32.) Soon after, in an internal e-mail dated November, 18, 2005, Scott Hudson ("Hudson"), a Bituminous employee, shared his thoughts on the value of this case with Bob Baker ("Baker"), Bituminous' mid-atlantic branch claims manager. (D.I. 42, Ex. 19.) After reviewing Maccari's case file, including the PIP payment, video surveillance, the IME documents, and the vocational expert's projected lost wages, Hudson concluded that his "top value" for the case was $150,000. (Id.) Hudson further explained that if the case could not settle at that amount, that he would be willing to have the case arbitrated on November 22, 2005. (Id.) Baker agreed with Hudson's recommendation and discussed extending settlement authority to Dolan. (Id.) Dolan conveyed a $50,000 offer to Penza in November 2005. (D.I. 42, Ex. 33 at 7.) After the initial offer was rejected, Dolan offered Bituminous' top value of $150,000.[2] (Id.; D.I. 42, Ex. 37.)

The arbitration did not occur as initially scheduled on November 22, 2005, because Penza requested a postponement. In a letter dated November 21, 2005, Penza explained that the parties agreed to postpone the UIM arbitration "due to recent medical recommendations that were made to [Maccari] at his doctor's appointment on November 17, 2005." (D.I. 42, Ex. 20.)

The next major event occurred on March 7, 2006, when Maccari had surgery for a cervical fusion of his C-1 to C-4 vertebrae. (D.I. 1 ¶ 22.) In the operative report signed March 9, 2006, Dr. Donlin Long ("Dr. Long"), a surgeon at Johns Hopkins Hospital ("Johns Hopkins"),

---

[2] Penza claims that the $50,000 and $150,000 were never offered during 2005. (D.I. 59 at ¶ 6.)

explained: "The problem was immediately apparent as soon as we had the muscle reflected. . . .
The ligamentous destruction was total, and I could actually move the joints with my fingers
alone. . . . We had hoped that 1 to 3 would be adequate, but the 3-4 injury was so obvious that we
felt that it had to be included." (D.I. 61 at B19.) On April 17, 2006, Dr. Long recorded that
Maccari was "doing quite well." (D.I. 42, Ex. 23.) He also recorded that Maccari started "an
isometric and simple range of motion program today" and that he "will begin much more
vigorous physical therapy" in about a month. (Id.) Dr. Long concluded that "[Maccari] is doing
extremely well." (Id.)

  In a letter dated May 4, 2006, Dolan explained that Bituminous had not received
Maccari's complete medical record from Johns Hopkins as sought in its previous subpoena and
asked Penza to send any materials that he may receive. (D.I. 42, Ex. 26.) In May, Mary Bauer
("Bauer"), Bituminous' senior claims adjuster, sent an internal e-mail to Baker with her
evaluation of the claim. (D.I. 61 at B21.) She concluded that based on her analysis at that time,
"the recommended indemnity reserve would be $350,000-$400,000." (Id.) There are
handwritten notes under the text of the e-mail that calculate pain and suffering to be $250,000.
(Id.) On May 12, 2006, Bauer prepared a "File Evaluation Worksheet" in which she listed
$150,000-$650,000 as the "recommended settlement value" and $200,000-$500,000 as the
"verdict range." (D.I. 61 at B22.) Bauer noted that Penza "made a $650,000 demand." (Id.)
She also commented that "the value of the claim at this point is negligible based on the
successful results" of Maccari's surgery. (Id.)

  In a letter dated June 7, 2006, Dr. Ira Garonzik ("Dr. Garonzik"), a surgeon at Johns
Hopkins, wrote in response to Penza's inquiry. (D.I. 42 Ex. 24.) Dr. Garonzik explained that it
was "too soon to tell how much improvement [Maccari] is going to get from this procedure and

what his permanent disability will be." (Id.)  He further explained that Maccari had

"significantly improved." (Id.)  Dr. Garonzik concluded: "I would like to continue to follow him

for approximately six to twelve months until I would make recommendations regarding his final

disability and improvement related to the surgery and this injury." (Id.)  In a letter dated October

19, 2006, Dr. Garonzik responded to an inquiry from Penza. (D.I. 42 at Ex. 36.)  Dr. Garonzik

stated that he agreed with Dr. Fink's August 2005 report, which concluded that Maccari "is

limited to a light duty position which does not involve detailed cognitive function." (Id.)

On November 21, 2006, Penza provided Dolan with medical records, which were

requested in May. (D.I. 42, Ex. 27.)  Dr. Fink examined Maccari again in December 2006 and

reviewed his current medical records. (Id.)  In a letter dated December 8, 2006, Dr. Fink

concluded that Maccari "is physically capable of working in a light duty position as previously

noted." (D.I. 42, Ex. 11 at 2.)

On December 1, 2006, Maccari was videotaped performing the following tasks: working

on a vehicle, bending at the waist and pulling the front of the vehicle towards himself, dragging

and carrying a trashcan to the outside dumpster, lifting the dumpster lid using his left arm, lifting

the trashcan, and emptying the trashcan into the dumpster using both hands. (D.I. 42, Ex. 18 at

NDM2058.)  Additionally, in a letter dated December 18, 2006, Ellen Lock, a vocational

consultant, compiled a labor market survey packet, which identified jobs available for Maccari

based on his physical and vocational capabilities. (D.I. 64, Ex. 4.)

In a letter dated January 12, 2007, Penza rescinded and withdrew his $900,000 settlement

demand because Bituminous failed to respond. (D.I. 1 ¶ 31.)  On January 19, 2007, a week

before the scheduled arbitration, Dolan left his law firm. (D.I. 42, Ex. 29.)  A new attorney,

Armand Della Porta, Jr., was assigned to represent Bituminous. (Id.)

On January 23, 2007, Bauer submitted a "Claims Committee Review Summary." (D.I. 42, Ex. 14.) Bauer noted that "in spite of [Maccari's] claim for being unable to work, we have him consistently attending a job via surveillance." (Id.) She also stated that "his condition will improve and there are no indications from any of the doctors that he will require any more surgical intervention." (Id.) Bauer concluded that the "the plaintiff is employable and has been working." (Id.) Based on her analysis, Bauer requested settlement authority in the amount of $381,000. (Id.)

On January 25, 2007, the day before the scheduled arbitration, Bituminous offered Maccari $500,000, but it was rejected. (D.I. 59 ¶ 11.) On January 26, 2007, a few hours before the arbitration, Bituminous offered Maccari $750,000, but it was also rejected. (D.I. 59 ¶ 12.) The binding arbitration was held before a panel. (D.I. 59 ¶ 13.) In a split decision dated February 20, 2007, the arbitrators awarded Maccari $1,000,000 in compensatory damages, which was the policy limit. (D.I. 1 ¶ 36; D.I. 61 at B24.) However, the arbitrators rejected Maccari's claim for pre-judgment interest. (Id.) Within a few days of the arbitration award, the parties communicated in order to arrange Maccari's payment. (D.I. 42, Ex. 37.)

More than two years after the binding arbitration and payment of compensatory damages, on February 26, 2009, the Maccari plaintiffs filed the present lawsuit. (D.I. 1.)

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). After the

moving party has carried its initial burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586-87. The court must "view all underlying facts and all reasonable inferences therefrom in the light most favorable" to the nonmoving party. *Pennsylvania Coal Ass'n v. Babbit*, 62 F.3d 231, 236 (3d Cir. 1995). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id.* Therefore, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## IV.   DISCUSSION

Bituminous contends that summary judgment is appropriate. First, Bituminous asserts that it did not act in bad faith or breach the duty of good faith and fair dealing. Bituminous reasons that its refusal to pay Maccari's settlement demands was not "clearly without any reasonable justification," which is the standard under Delaware law. (D.I. 40 at 17.) Bituminous states that the parties had a bona fide dispute over the extent to which Maccari could work and how much he could earn. (Id.)

Second, Bituminous asserts that, at a minimum, the court should deny the Maccari plaintiffs' request for punitive damages. (D.I. 40 at 19.) Bituminous argues that it did not exhibit the "egregious conduct" required for a punitive damages award. (D.I. 40 at 19-20.) Bituminous insists that it had sufficient justification for not acceding to Maccari's settlement demands. (Id.)

The Maccari plaintiffs contend that summary judgment is precluded. First, the Maccari plaintiffs assert that Bituminous is liable for bad faith breach of contract and claim that there are

genuine issues of material fact on the issue of unreasonable delay. (D.I. 58 at 3.) The Maccari

plaintiffs claim that Bituminous neither responded to their settlement demands nor extended any

settlement offers until 2007, despite the fact that the "evidence shows that by May 2006,

Bituminous knew that [Maccari] was dramatically limited in his future employment." (D.I. 58 at

19.)

Second, the Maccari plaintiffs assert punitive damages are recoverable and that there are

genuine issues of material fact on the issue of "reckless indifference." (D.I. 58 at 4.) The

Maccari plaintiffs find it problematic that Bituminous did not respond promptly to their

settlement demands and argue that Bituminous repeatedly departed from its claims-handling

standards. (D.I. 58 at 20.)

### A.      Bad Faith Breach of Contract and The Duty of Good Faith and Fair Dealing

The Maccari plaintiffs' bad faith claim is rooted in state law. "As a basic premise,

federal courts sitting in diversity cases are required to apply the substantive law of the state

whose laws govern the action." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir.

1990) (citation omitted). *See also Thurston v. Liberty Mut. Ins. Co.*, 16 F. Supp. 2d 441, 448 (D.

Del. 1998).

Under Delaware law, if "an insurer fails to investigate or process a claim or delays

payment in bad faith, it is in breach of the implied obligations of good faith and fair dealing

underlying all contractual obligations." *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d

254, 264 (Del. 1995). The Delaware Supreme Court held that a "lack of good faith, or the

presence of bad faith, is actionable where the insured can show that the insurer's denial of

benefits was 'clearly without any reasonable justification.'" *Id.* (citing *Casson v. Nationwide*

*Ins. Co.*, 455 A.2d 361, 369 (Del. Super. Ct. 1982)). *See also Dunlap v. State Farm Fire & Cas.*

*Co.*, 878 A.2d 434, 440 (Del. 2005). Therefore, "[m]ere delay is not evidence of bad faith, provided that a reasonable justification exists for refusing to make payment upon submission of proof of loss." *Tackett*, 653 A.2d at 266. In determining reasonableness, the "ultimate question is whether at the time the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability." *Casson*, 455 A.2d at 369.

Considering the record in the light most favorable to the Maccari plaintiffs, the court concludes that summary judgment is appropriate. The record establishes that there was a bona fide dispute over the extent of Maccari's injuries and his ability to work. The Maccari plaintiffs allege that Maccari's surgery on March 7, 2006, "should have eliminated any good faith basis to deny the processing and payment of the fair value of the plaintiffs' claims." (D.I. 1 ¶31; D.I. 58 at 19.) However, Bituminous counters that the post-operative medical reports did not resolve the dispute. In particular, in June 2006, Maccari's surgeon, Dr. Garonzik stated that he needed at least six to twelve months before he could fully assess the efficacy of the surgery. (D.I. 42, Ex. 24.) In October of 2006, Dr. Garonzik, concluded that Maccari is limited to a light duty position. (D.I. 42 at Ex. 36.) Additionally, in December of 2006, Bituminous' IME, Dr. Fink, found that Maccari was still capable of working in a light duty position. (D.I. 42, Ex. 11 at 2.) Moreover, video surveillance from December 2006 showed Maccari working. (D.I. 42, Ex. 18 at NDM2058.) These facts viewed in the plaintiffs' favor only establish that there was a bona fide dispute between the parties regarding the extent to which Maccari could work.

Bituminous argues that even if Maccari was unable to work full time as he stated, his $100,000 per year claim for lost wages as a painting contractor was unfounded. To supports its position, Bituminous provides a letter from its attorney, which shows the net income of

Maccari's painting business based on tax returns from 1998-2003. (D.I. 42, Ex. 29 at 2.)  During

that time, Maccari's painting business never earned more than $30,000 per year. (Id.)  In

addition, the 2001 PIP arbitration decision indicated that Maccari's total earnings capacity was

about $25,000 per year. (Id.)  The Maccari plaintiffs claim that Bituminous confuses the issue

by focusing on net income instead of gross receipts, which were greater than $300,000 from

1999-2001 as evidenced by business tax returns. (D.I. 61, Ex. B1-B3.)  These facts viewed in

the plaintiffs' favor only establish that there was also a bona fide dispute between the parties

regarding how much Maccari could earn.  Thus, the court agrees that Bituminous had a

reasonable basis not to accept the Maccari plaintiffs' settlement demand, which it considered too

high, prior to the binding arbitration.

This case is distinguishable from *Tackett*.  In that case, the court reasoned that "[d]elays

attributed to a 'get tough' policy, *i.e.*, a general business practice of claims denial without a

reasonable basis, may subject the insurer to a bad faith claim." *Tackett*, 653 A.2d at 266.  The

evidentiary record showed that there was a delay in paying policy limits "in the face of full

documentation and recommendations of the claim agent and outside counsel." (*Id.*)  Here,

Bituminous asserts that it does not have a policy or practice of claims denial.  In support of its

assertion, Bituminous provides a letter dated April 9, 2010, from the Delaware Department of

Insurance, which handles consumer complaints against insurers. (D.I. 42, Ex. 31.)  The letter

states that the department has no record of any complaints against Bituminous. (Id.)  Also,

unlike in *Tackett*, neither Bituminous' claims agent nor its outside counsel, ever determined that

Maccari's claim was worth the policy limit.  In fact, on January 23, 2007, four days before the

arbitration that ultimately resolved this matter, Bauer expressed her opinion in a "Claims

Committee Review Summary" that Maccari remained employable. (D.I. 42, Ex. 14.)  Bauer

based this opinion on Maccari's medical records and video surveillance. (Id.) These statements support Bituminous' position that it had a reasonable justification for not settling the case at the amount that the Maccari plaintiff's demanded prior to arbitration.

Moreover, in *Tackett*, the court found that it agreed with the lower court that the plaintiffs "were not singled out for malicious treatment." *Tackett*, 653 A.2d at 266. Here, the court finds that based on the evidentiary record, Maccari was not singled out for malicious treatment. In fact, Bituminous was more than willing and able to proceed to arbitration when the matter was first scheduled on November 22, 2005. (D.I. 42, Ex. 19.) The record shows that Bituminous continued to investigate and assess the case until the binding arbitration occurred on January 26, 2007. (D.I. 1 ¶ 35.)

For the reasons discussed, the finding of a reasonable justification for Bituminous' action in not paying benefits prior to the arbitration precludes, as a matter of law, a finding of bad faith. *See Casson*, 455 A.2d at 370. Specifically, Bituminous is not liable for bad faith because of the unresolved questions concerning the extent to which Maccari could work and the amount he could earn.

### B.     Punitive Damages

In *Tackett*, the Delaware Supreme Court held that "an insured may be entitled to the recovery of punitive damages in a bad faith action if the insurer's breach is particularly egregious." *Tackett*, 653 A.2d at 265. More specifically, "if the denial or delay is wilful [sic] or malicious, it may provide the basis for punitive damages. In the latter event, there must be an element of malice with a 'reckless indifference' to the plight of the insured." *Id.* at 266 (*quoting Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987)). In *Jardel*, "reckless" is explained as "conscious indifference to the rights of others." *Jardel*, 523 A.2d at 530.

Given the court's determination that, as a matter of law, Bituminous is not liable for bad faith, there is no basis for awarding punitive damages in this case. Even if a bad faith claim existed, the Maccari plaintiffs' claim for punitive damages is not sufficient to meet the legal standard. The Maccari plaintiffs' allegations do not constitute a showing of "willful," "malicious" or "reckless indifference," as required for an award of punitive damages under Delaware law. Furthermore, "mere inadvertence, mistake or errors of judgment which constitute mere negligence" are not sufficient. *Tackett*, 653 A.2d at 265. Therefore, the court will grant Bituminous' motion for summary judgment.

## V.  CONCLUSION

For the aforementioned reasons, the court will grant Bituminous' motion for summary judgment on all counts pursuant to Federal Rule of Civil Procedure 56.[3]

Dated: December ___, 2010

CHIEF UNITED STATED DISTRICT JUDGE

---

[3] Since the court granted Bituminous' summary judgment motion on all counts, the Maccari plaintiffs' motion for partial summary judgment on *res judicata* (D.I. 43) is denied as moot. Likewise, the parties' motions in liminine (D.I. 80; D.I. 82-88) are also denied as moot.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NICHOLAS D. MACCARI and VICTORIA R. MACCARI, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   C.A. No. 09-258 (GMS) |
| BITUMINOUS CASUALTY CORPORATION, | ) ) ) |
| Defendant. | ) ) ) |

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY
ORDERED that:

1.  The defendant's motion for summary judgment (D.I. 39) is GRANTED.

Dated: December ____, 2010

_____
CHIEF, UNITED STATED DISTRICT JUDGE

16